UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CAROLINA MIGRANT NETWORK, AMICA CENTER FOR IMMIGRANT RIGHTS,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>　　　　　Defendant. | Case No. 3:26-cv-28<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION AND BACKGROUND

1.　Defendant Immigration and Customs Enforcement (ICE) has a great deal of discretion to detain or release noncitizens who are awaiting resolution of their immigration court proceedings, outside of those subject to mandatory detention. ICE uses the Alternatives to Detention (ATD) program as a way to monitor certain noncitizens it releases into the community.

2.　The ATD program uses various forms of monitoring to purportedly ensure that enrolled individuals comply with their release conditions, including attendance at immigration court hearings. The various forms of monitoring include GPS location-monitoring devices such as ankle monitors and the SmartLink phone app; geographic restrictions on movement; curfews; and in-person and telephonic check-ins.

3.　While labeled as an "alternative" to physical detention, ICE's ATD program is not an actual alternative to detention but rather a different form of ICE

custody over noncitizens, including physical restraint on individuals' bodies and movements.

4. As noted in a 2024 petition for rulemaking to the Department of Homeland Security (DHS) and the Department of Justice (DOJ) from 29 different legal service organizations from across the country, ICE's use of ATD dwarfs its use of detention centers and has rapidly expanded in the past five years.[1] As of December 2025, ICE had over 181,000 individuals enrolled in ATD monitoring—nearly *3 times* the number of individuals in ICE detention facilities.[2] Of those individuals, more than 36,000 are currently wearing ICE ankle monitors, nearly double the number of people ICE had on ankle monitors at the end of 2024.[3]

5. While less expensive than physical incarceration, the cost of this technology is extraordinary. For the various forms of ATD, ICE spends nearly $250,000 *a day*.[4]

6. This form of ICE custody is also far from short-lived for noncitizens. On average, noncitizens remain in ATD programs 744 days (more than 2 years), with some regional ICE offices continuing noncitizens' enrollment for nearly 3 years.[5]

---

[1] Amica Center, et. al, *Petition for Rulemaking: Immigration Judge Review of Immigration & Customs Enforcement's Alternatives to Detention Conditions of Supervision* (July 12, 2024) available at http://amicacenter.org/app/uploads/2024/07/Amica-Center-et-al-Petition-for-Rulemaking-re-IJ-review-of-ATD-conditions.pdf
[2] *See* DHS ICE, *Detention Management,* (last updated Dec. 22, 2025) data available at https://www.ice.gov/doclib/detention/FY26_detentionStats12222025.xlsx.
[3] *See id.*
[4] *See* DHS ICE, *Detention Management*.
[5] *Id.*

7. Despite ICE's stated goals of using ATD monitoring to ensure noncitizen compliance with immigration laws, several reports have found that noncitizens subjected to ATD monitoring had *lower* compliance rates, particularly where other supportive alternatives exist, such as community-based case management.[6] Moreover, ICE's costly, lengthy, and unnecessary surveillance of noncitizens' every move– especially its use of ankle monitors – causes serious financial, physical, and psychological damage over these protracted periods. Ankle monitors "can disrupt almost every aspect of daily life, from sleeping and exercising to buying groceries and getting a job."[7] The ankle monitors can and do result in physical injuries ranging from discomfort to life-threatening symptoms.[8] In one study, nearly 60% of surveyed noncitizens reported that the ankle monitor's impact on their health was severe or very severe, including aggravation of serious pre-existing health conditions like diabetes and leukemia.[9] The harms of ankle monitors

---

[6] *See* American Bar Association Commission on Immigration, *Electronic Monitoring of Migrants: Punitive not Prudent* at 25-26 (Feb. 2024) ("Punitive not Prudent"), https://www.americanbar.org/content/dam/aba/administrative/immigration/electronic-monitoring-report-2024-02-21.pdf; Women's Refugee Commission, "The Family Case Management Program: Why Case Management Can and Must Be Part of the US Approach to Immigration," (June 2019), available at https://www.womensrefugeecommission.org/wp-content/uploads/2020/04/The-Family-Case-ManagementProgram.pdf (finding that the Family Case Management Program achieved a 99% compliance rate with ICE and immigration court requirements).
[7] *See* David Yaffe-Bellany, *"It's Humiliating": Released immigrants Describe Life with Ankle Monitors*, Tex. Trib. (Aug. 10, 2018) available at https://www.texastribune.org/2018/08/10/humiliating-released-immigrants-describe-life-ankle-monitors/.
[8] See Tosca Giustini, et al., Benjamin N. Cardozo School of Law, *Immigration Cyber Prisons: Ending the Use of Electronic Ankle Monitors*, LARC ONLINE PUBLICATIONS 12 (July 2021) available at https://larc.cardozo.yu.edu/faculty-onlinepubs/3/ ("Immigration Cyber Prisons").
[9] *Id.* at 14.

3

are further compounded by the impact on a large majority of noncitizens' mental health, and in some instances, caused them to have suicidal thoughts.[10]

8. In July of 2025, the Washington Post reported that ICE had issued a new policy memorandum regarding ATD on June 9, 2025 ("the June 9th memo").[11] This new memo was attributed to Acting Assistant Director Dawnisha M. Helland of ICE's Non-detained Management/ATD leadership. According to said reporting, this memo from ICE "ordered staff to place ankle monitors on *all people* enrolled in the agency's [ATD] program 'whenever possible,'" with the only exception being pregnant women "who would be required to wear wrist-worn tracking devices." Director Helland instructed that "If the [noncitizen] is not being arrested at the time of reporting, escalate their supervision level of GPS ankle monitors whenever possible and increase reporting requirements."[12] Since the July coverage from the Washington Post regarding the June 9th memo, numerous media outlets have reported on the issue.[13]

---

[10] *Id.* 14-16.
[11] *See* Marianne LeVine, et al., *ICE moves to shackle some 180,000 immigrants with GPS ankle monitors*, WaPo (July 24, 2025) available at https://www.washingtonpost.com/immigration/2025/07/24/ice-check-in-ankle-monitor-immigrants/
[12] *Id.*
[13] Immigration Policy Tracking Project, *Reported: ICE expands use of ankle monitors for immigrants in Alternatives to Detention program* (July 24, 2025) (summarizing the June 9 memo and its requirement to escalate supervision to GPS monitors) available at https://immpolicytracking.org/policies/reported-ice-expands-use-of-ankle-monitors-for-immigrants-in-alternatives-to-detention-program/; Elaine Mallon, *ICE memo calls personnel to fit migrants in ankle monitors 'whenever possible'*, The National News Desk (July 25, 2025) available at https://thenationaldesk.com/news/americas-news-now/ice-puts-ankle-monitors-on-immigrants-tom-homan-smartlink-border-donald-trump; FAIR, *ICE May Expand Use of Electronic Monitoring and GPS Tracking* (July 30, 2025) available at https://www.fairus.org/news/executive/ice-expand-electronic-monitoring-gps-tracking; Anthony Kimery, *ICE's expanding use of ankle monitors ignites surveillance, privacy concerns*, BiometricUpdate (July 28, 2025) available at https://www.biometricupdate.com/202507/ices-expanding-use-of-ankle-monitors-ignites-surveillance-privacy-concerns; Mabinty Quarshie, *Tom Homan backs expanded GPS monitoring of illegal immigrants*, The Denver Gazette (July 24, 2025) available at https://www.denvergazette.com/2025/07/24/tom-homan-backs-expanded-gps-monitoring-of-illegal-immigrants-ffd0411f-db38-58f3-9572-a97a7f9e616c/;

9. ICE has yet to make this memo publicly available.

10. The expansion of ICE's ankle monitoring to potentially over 180,000 noncitizens will also financially benefit GEO Group,

> [the] private prison conglomerate that previously employed at least two of Trump's top immigration officials and donated over $1.5 million to the president's 2024 campaign and inaugural committee. The tracking program is entirely run by BI Inc., a subsidiary of GEO. . . This month, the agency issued BI a one-year extension on its immigrant monitoring contract — bypassing a planned competitive bidding process that was expected to open the program to multiple new vendors. . . Because each ATD participant generates about $3.70 in revenue per day, a rapid expansion could amount to hundreds of millions of dollars in new revenue per year . . . .[14]

11. As media reporting on ATD makes apparent, ICE's true purpose in imposing a blanket "ankle monitoring for all" policy is the goal of coercing noncitizens into accepting "voluntary" deportation. When asked about ATD and the June 9th memo, an ICE spokesperson said, "Any illegal alien who is worried about having to wear an ankle monitor or any other GPS devices should accept the $1,000 stipend from the U.S. government and free flight home by self-deporting through the CBP Home App."[15] This punitive new policy confirms the American Bar Association's previous assessment that ICE's ATD monitoring is generally "punitive in nature because it is imposed without objective assessment of either need or risk in a one-size-fits-all approach. Indeed, the current, and increasingly widespread,

---

[14] *Id.*
[15] Elaine Mallon, *ICE memo calls personnel to fit migrants in ankle monitors 'whenever possible'*.

misuse of monitoring may violate constitutional standards guaranteeing liberty and due process."[16]

12. Given the tremendous impact of ICE's dramatically increased ankle monitoring on noncitizens' lives, health, and access to due process, Plaintiffs Carolina Migrant Network (CMN) and Amica Center for Immigrant Rights (Amica Center) seek the June 9th memorandum and related records.

## **JURISDICTION AND VENUE**

13. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). Plaintiffs' request for declaratory and other relief is properly subject to this Court's subject-matter jurisdiction pursuant to 5 U.S.C. §§ 552(a)(4)(F), 701-06 and 28 U.S.C. §§ 1331, 2201(a), and 2202.

14. Venue is proper within this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1) because Plaintiff Carolina Migrant Network has its principal place of business in Charlotte, North Carolina.

15. Plaintiffs have constructively exhausted all administrative remedies in connection with their FOIA request, as detailed below.

16. Under the latter provision, this court may retain jurisdiction and allow Federal Defendants additional time to complete the processing of Plaintiffs' FOIA requests if, <u>and only if</u>, the government can demonstrate that exceptional circumstances exist ***and*** their due diligence in responses to Plaintiffs' requests. Because Defendants can demonstrate neither, this Court has jurisdiction to declare

---

[16] *See* American Bar Association, *Electronic Monitoring of Migrants* at 4.

unlawful the agencies' withholdings and order immediate production of records unlawfully withheld.

17. Because Plaintiffs bring this action after constructively exhausting administrative remedies, this Court's jurisdiction is based on 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(6)(A)(i).

## PARTIES

18. Plaintiff Carolina Migrant Network (CMN) is a 501(c)(3) nonprofit organization located in Charlotte, NC, whose core mission is to provide legal services for individuals in removal proceedings. CMN provides legal education on the U.S. immigration system and empowers immigrant communities to participate in everyday and civic life. CMN envisions a world of empowered, self-determined, organized communities free from fear of family separation. CMN regularly disseminates information to the public about immigration enforcement practices in North Carolina. In addition to providing direct representation to immigrant communities, CMN publishes critical information on noncitizen rights, issues press releases, and shares analyses with journalists, policymakers, and the public through newsletters, its website, and social media channels.

19. Plaintiff Amica Center for Immigrant Rights is a 501(c)(3) nonprofit organization that provides legal services to noncitizens in ICE custody across the country, including in North Carolina. Originally started as a project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs, Amica Center became an independent non-profit organization in 1999. Amica Center's mission is
7

to confront the impact that the unjust immigration system has on its clients and communities through direct legal representation, impact litigation, education, and client-centered advocacy. In addition to providing direct representation to immigrant communities, Amica Center publishes critical information on noncitizen rights, issues press releases, and shares analyses with journalists, policymakers, and the public through newsletters, its website, and social media channels.

20. ICE is a federal agency within the meaning of FOIA, 5 U.S.C. § 552(a)(1)(f). ICE has possession, custody, and control of records responsive to Plaintiffs' request.

21. Plaintiffs seek a declaration that Defendant ICE has improperly withheld records that will shed light on the circumstances of ICE's ankle monitoring policies, including, but not limited to, the June 9th memo, and requiring Defendants to immediately process and release the requested records.

## FACTS

### ICE FOIA Request

22. On October 28, 2025, Plaintiffs submitted a FOIA request to ICE seeking records related to Director Helland's June 9, 2025, memorandum or guidance regarding ATD, check-ins, and the directive to use GPS ankle or wrist monitors for non-detained individuals. Additionally, Plaintiffs sought records regarding the implementation, appendices, standard operating procedures, or field guidance transmitter with the memorandum. Plaintiffs also sought a fee waiver and

expedited processing of their request. Plaintiffs' FOIA request is attached as Exhibit A.

23. On November 21, 2025, ICE contacted Plaintiffs to confirm receipt of the FOIA request with ICE as of October 28, 2025, and assigned the request a control number of 2026-ICFO-03195. ICE's receipt notice is attached as Exhibit B. In this email, ICE indicated that it was denying Plaintiffs' expedited processing request and appeared to deny Plaintiffs' request for a fee waiver. *See* Ex. B at 1-2.

24. Plaintiffs replied the same day, appealing the FOIA office's denial of the request for expedited processing and the apparent denial of the fee waiver. On November 24, 2025, ICE confirmed receipt of the appeal and assigned Plaintiffs' appeal a control number of 2026-ICAP-00047. ICE's confirmation of Plaintiffs' appeal is attached as Exhibit C.

25. On December 28, 2025, ICE's Government Information Law Division (GILD) affirmed ICE's prior decision to deny expedited processing of Plaintiffs' request. This appeal decision made no mention of ICE's apparent denial of Plaintiffs' fee waiver request. ICE stated that Plaintiffs' "underlying FOIA request will continue to be processed under FOIA Request No. 2026-ICFO-03195 in the order in which it was received, consistent with ICE's normal processing queues." ICE's decision regarding Plaintiffs' appeal is attached as Exhibit D.

26. As of the time of this filing, ICE has not issued a determination with respect to Plaintiffs' FOIA request for records, and therefore, Plaintiffs have exhausted their administrative remedies.

9

Case 3:26-cv-00028 Document 1 Filed 01/14/26 Page 9 of 17

27. ICE has failed to comply with the FOIA statute's timeliness provisions with respect to Plaintiffs' request.

28. As of the time of this filing, ICE has not conducted a search for records responsive to Plaintiffs' request.

29. ICE has not made a decision or otherwise taken action on the substance of Plaintiffs' request that could be appealed.

30. ICE has not indicated to Plaintiffs what records it intends to produce and what records it intends to withhold.

31. ICE has failed to make the records responsive to Plaintiffs' request promptly available.

32. ICE has improperly withheld records from Plaintiffs responsive to their request.

33. ICE has an ongoing pattern and practice of improperly withholding records from requestors, including Plaintiffs, in violation of FOIA.

34. Under FOIA, ICE has a duty to affirmatively disclose up-to-date information regarding its policies, procedures, and memoranda, including the June 9th memorandum.

35. Under FOIA, ICE cannot apply any policies, instructions, or interpretations—including the June 9th memorandum—that affect a member of the public unless it has first made them available to the public or the individual member of the public who has actual and timely notice of the terms thereof.

//

## CLAIMS FOR RELIEF

### COUNT ONE

**Failure to make a determination in violation of FOIA**

36. Plaintiffs incorporate the allegations in paragraphs above as though fully set forth here.

37. Defendant and its components are obligated under 5 U.S.C. § 552(a)(6) to make a determination with respect to Plaintiffs' request within the statutorily mandated time period of 20 business days, to be extended by no more than 10 business days in the event that the agency notifies the requestor in writing of the existence of "unusual circumstances." When Defendant failed to make a determination or respond to a FOIA request within the statutory deadline, it constructively denied the request. *See Oglesby v. U.S. Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990) ("Congress adopted the time limit provision in the FOIA in order to 'contribute to the fuller and faster release of information, which is the basic objective of the Act.'" (quoting H.R. Rep. No. 93-876, 93d Cong. 2d Sess., reprinted (1974) U.S. Code Cong. & Ad. News 6267 at 6271).

### COUNT TWO

**Failure to conduct an adequate search in violation of FOIA**

38. Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here.

39. Plaintiffs properly requested records within the possession, custody, and control of Defendant.

40. Defendant has not produced any records in response to Plaintiffs' request and has not communicated a determination as to Plaintiffs' requests.

41. Defendant and its subcomponents are obligated under 5 U.S.C. § 552(a)(3)(C) to conduct a reasonable search for records responsive to Plaintiffs' request within FOIA's timing requirements.

42. Defendant has not conducted a "search reasonably calculated to uncover all relevant documents" pursuant to Plaintiffs' detailed and specific request. Defendant is also required and has failed to "make reasonable efforts to search for the records in electronic form or format." 5 U.S.C. § 552(a)(3)(C).

43. Defendant has also failed to determine a production scope and which records it intends to withhold and which it intends to produce.

44. Defendant has a pattern or practice of failing to conduct an adequate search for responsive records to FOIA requests within FOIA's timing requirements. No legal basis exists for Defendant's pattern or practice of failing to meet the statutory deadline with respect to conducting an adequate search.

45. Plaintiff is entitled to declaratory and injunctive relief requiring Defendant to promptly search for and produce all responsive non-exempt records and provide indexes justifying any withholding of responsive records they believe are exempt.

## COUNT THREE

### Wrongful withholding of non-exempt responsive records

46. Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

47. Plaintiff properly requested records within the possession, custody, and control of Defendant.

48. Defendant is improperly withholding non-exempt agency records by failing to produce the non-exempt records responsive to the Plaintiffs' requests.

49. Defendant is improperly withholding non-exempt information in otherwise non-exempt agency records.

50. Defendant's failure to provide all non-exempt responsive records violates FOIA.

51. Plaintiffs are entitled to declaratory and injunctive relief requiring Defendant to promptly produce all non-exempt records responsive to Plaintiffs' FOIA requests, segregate all exempted information in otherwise non-exempt records, and provide indexes justifying the withholding of any responsive records it argues is exempt.

## COUNT FOUR

**Failure to publish opinions, policies, administrative staff manuals, and instructions to staff that affect the public**

52. Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

53. Defendant and its components are obligated under 5 U.S.C. §§ 552(a)(1)-(a)(2) to affirmatively disclose to the public, via the Federal Register, any substantive rules of general applicability as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency as well as any amendments, revisions, or repeals of the aforementioned.

The failure to do so, except where a person has actual and timely notice of the terms thereof, may not in any manner be adversely affected by a matter required to be published in the Federal Register and not so published.

54. Defendant has not published its current ATD guidance, interpretations, or other instructions or any changes thereto—including the June 9th memorandum—in the Federal Register and is in violation of FOIA and therefore cannot apply its current ATD guidance to the public without doing so.

## COUNT FIVE

### Denial of Expedited Processing

55. Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

56. FOIA provides this Court with jurisdiction to review [a]gency action to deny or affirm denial of a request for expedited processing," as well as "failure by an agency to respond in a timely manner to such a request." 5 U.S.C. § 552(a)(4)(B) & (a)(6)(E)(iii).

57. Defendant has arbitrarily or capriciously denied Plaintiffs' proper and justified request for expedited processing in violation of FOIA.

## COUNT SIX

### Actual or Constructive Denial of Fee Waiver

58. Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

59. FOIA provides this Court with jurisdiction to review the agency's failure to waive fees de novo. 5 U.S.C. § 552(a)(4)(A)(vii).

60. Defendants have actually or constructively denied Plaintiffs' fee waiver request in violation of FOIA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

a. Declare, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendant violated the Freedom of Information Act, 5 U.S.C. § 552;

b. Declare that Plaintiffs are entitled to a determination on their requests from Defendant;

c. Declare that Plaintiffs are entitled to disclosure of the requested records;

d. Declare that Defendant has failed to conduct an adequate search for responsive records and has failed to segregate and produce any non-exempt portions of those records;

e. Declare that Defendant has violated FOIA by failing to publish its current ATD guidance, instructions, or policies, including the June 9th memorandum;

f. Declare that Defendant's violation of FOIA by failing to publish its current ATD guidance, instructions, or policies, including the June 9th memorandum, renders its application of that guidance unlawful;

g. Order Defendant to begin searching for responsive records to Plaintiffs' request;

h. Order expeditious proceedings in this action pursuant to 5 U.S.C. § 552; 28 U.S.C. § 1657; and FRCP 12(a)(2) (Courts are not required to automatically accord expedited treatment to a FOIA lawsuit; however as with other civil actions, they may do so "if good cause therefore is shown.");

i. Order Defendant to waive all fees with respect to Plaintiffs' FOIA request;

j. Order Defendant to prepare an index pursuant to *Vaugh v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), for any documents it seeks to withhold under a FOIA exemption;

k. Enjoin Defendant from continuing to withhold any and all non-exempt records responsive to Plaintiffs' request;

l. Enjoin Defendant from its ongoing violations of FOIA by failing to publish its current ATD guidance, policies, memoranda, and instructions;

m. Retain jurisdiction of this action to ensure that no agency records are improperly withheld;

n. Award Plaintiff attorneys' fees and litigation costs incurred in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

o. Order such other relief as the Court may deem just and proper.

Dated: January 14, 2026

Respectfully submitted,

By: /s/ Daniel Melo

Daniel Melo
The Melo Law Firm
NC Bar # 48654
2920 Forestville Road, Ste 100
PMB 1192
Raleigh, NC 27616
Tel: (919) 348-9213
dan@themelolawfirm.com
*Pro Bono Counsel For Plaintiffs*

*/s/ F. Evan Benz*
F. Evan Benz, Esq.
NC Bar No. 49077
AMICA CENTER FOR IMMIGRANT RIGHTS

1025 Connecticut Ave NW Ste. 701
Washington, DC 20036
Phone: (202) 869-3984
evan@amicacenter.org
*Pro Bono Counsel for Plaintiffs*